IN  THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

ELLIS LEE HICKMAN, JR. #333-443
     Petitioner                        :

    v.                          :     CIVIL ACTION NO. CCB-14-339

BOBBY SHEARIN, WARDEN, et al.,    :
     Respondents

**MEMORANDUM**

A response to the petition for writ of habeas corpus with exhibits, as supplemented, was filed in the above-captioned case.  The matter is now ready for review.  The court finds no need for an evidentiary hearing.  *See* Rule 8(a), *Rules Governing Section 2254 Cases in the United States District Courts*; Local Rule 105.6 (D. Md. 2014).  For the reasons to follow, the petition will be denied.

**Factual and Procedural History**

Petitioner Ellis Lee Hickman was charged with first- and second-degree murder, stalking, harassment, robbery, first-degree burglary, and arson in the Circuit Court for Baltimore County. (ECF No. 7, Ex. 1 at 3-5.)  After a jury trial, petitioner was convicted of first-degree murder, arson, and harassment (which merged into the first-degree murder conviction).  (*Id.* at 3-56.) The Court of Special Appeals of Maryland summarized the facts adduced at trial as follows:

> At trial, the State's theory of the case was that Hickman became "obsessed" with [Rakiyya] States, who lived in the apartment directly above the one Hickman shared with his fiancée. The prosecution presented evidence that, on a Sunday morning when his fiancée and other tenants were away, Hickman murdered States in her apartment, then summoned help from his brother, Torrance Davis. That evening, when Davis arrived with his friend, Shaheed Armstrong, and the gasoline that Hickman asked him to bring, Hickman used the gas to set a fire in an effort to cover up his crime. The defense theory was that someone else committed the murder and that Davis and Armstrong set the fire.

In the weeks before her murder, States reported to friends that she was being harassed by an unknown person who left several anonymous religious greeting cards on her car while it was parked at her apartment at 15 Mopec Circle in Baltimore. Terrynce Dandridge testified that he met States through work and they dated for a while and then became friends. Shortly before her death, States told Dandridge that she was "worried" about cards she had received from someone who did not sign a name, leaving only an email address. She reported that the cards were being left on her car at various times of the day. States told Dandridge that she planned to send an email telling the sender to stop leaving the cards "because they made her feel uncomfortable."

She later forwarded Dandridge a copy of her September 8, 2005, email to "doyou1972@yahoo.com" and a September 9th reply from that email address signed "ty.de." These emails were admitted into evidence.  The message from "Rakiyya States" at "rakiyyastates @yahoo.com" identifies the subject as "The Cards" and states: "When you leave cards and not sign them, or say who you are it can come off a little creepy. Who are you?" The reply states:

> I truly apologize for seeming creepy, I was only following the guidance of the Holy Spirit and being obediant [sic]. I hope the cards  lift  your  spirits and  made  you  smile,  it  really  was uncomfortable for me leaving them there but again I say, I was following the leading of the Spirit.

After receiving that reply, States told Dandridge that she "thought this person was crazy," so she changed her email address.

Dandridge testified that he saw States at a church choir rehearsal on the evening of Friday, September 23.  He expected to see her again on Sunday evening at a farewell party that the group was having for him, but States did not show up for the party. Shervon Bailey was States's best friend. The two spoke "every day" and attended church together on the Saturday before she was  murdered.   Bailey left  States's apartment just  before  midnight on Saturday.   She also expected to see her at Dandridge's farewell party on Sunday.

Bailey testified that States expressed concern about a male neighbor in the apartment below hers. States also showed Bailey the anonymous cards she had received and shared her worries about them. Bailey confirmed that States changed her email address "because she was scared."

On Sunday, September 25, 200[5], Matthew Hyle visited his daughter and ex-wife in their apartment, which was next door to States's.[1]  Hyle arrived between 6:00 and 6:30 p.m. After finishing dinner, his daughter went to take a bath. Hyle watched football while his ex-wife was bathing their daughter. During that time, Hyle heard the door of the adjacent apartment slam shut "two to three" times.  He

also heard "someone or people" run up and down the steps.  Sometime "probably" between 7:00 and 7:30 p.m. he smelled fumes. When he opened the front door to investigate, he saw black smoke coming from the apartment next door. He got his family out of the apartment and his ex-wife called 911.

On September 25, 2005, between 8:00 and 8:30 p.m., Janet Ruth Wilkins returned from an overnight visit with her son and boyfriend at her mother's home.  Her apartment was next door to the apartment shared by Hickman and his fiancée. While unloading groceries from her car, Wilkins saw a black male jump into the passenger's seat of a light "champagne silver" colored car.   The driver almost backed into her, then quickly pulled out, "peeling wheels."   When Wilkins entered the building, she immediately smelled gas and heard a smoke detector. The fire department arrived soon after.

Isaac Redd, another resident of the 15 Mopec Circle apartment building, arrived home from work at approximately 8:10 p.m. He lived in the apartment next door to Hickman and Webb, with his wife and son.[2]  There was a car parked in his designated parking space with two men he had never seen before standing behind the vehicle. Redd saw a gas can behind the car. Redd rolled down his window, prompting one of the men to offer to move the car. The men put the gas can in the open trunk, got in the car, then "took off" in a "rush."

Redd went into his apartment and showered.  His wife complained about "the noise that she heard overhead. . . since she had been home[.]" When a neighbor alerted him to the fire, Redd got his family out of the apartment.  Redd then went upstairs to States's apartment to see if anyone needed help. The apartment door "was black" and too hot for him to enter the apartment safely.   Redd waited outside with the other tenants, including Hickman and his fiancée, Sherri Webb, while firefighters and police officers responded.

Firefighters from Baltimore County Fire Department's Parkville Station Number 10 were dispatched at approximately 8:10 p.m. Captain Timothy Berkeridge was in the first fire truck on the scene. Lieutenant Thomas Brown, who was responsible for search and rescue, was with the first team of firefighters who entered the apartment.  Although there was considerable smoke in States's apartment, they did not find an active fire.

When the firefighters searched the apartment for occupants, Lt. Brown discovered States's body in the bathtub lying face down in several inches of water, blood, and gasoline. Frederick Hudnett, a fire investigator, testified that the fire was intentionally set, with gasoline used as an accelerant. Photographs of the apartment, showing where the fire burned in the living room, hallway, bedroom, and bath, were admitted into evidence.

Officers Sean Beckman and John Tollen were the first police officers to enter the apartment. Beckman was dispatched at 8:14 p.m. Corporal Mark Goralski arrived later. Between 9:00 and 9:30 p.m., Hickman and Webb approached Goralski to ask what was going on and how long they were going to be there. Hickman said that Ms. Webb could help identify who lived in the apartment building.

On the day of the fire, Ms. Webb testified that she went to work about 7:15 a.m., leaving her ex-fiancé Hickman at home alone. According to Webb, he planned to go to the store and cook dinner for her that evening.  When Webb arrived home between 6:00 and 6:30 p.m., Hickman was cooking in the kitchen.  He had picked up food and some beauty products that she had requested. Hickman looked normal, with no bruises or scratches, and she did not smell gas on him. Approximately an hour later, the two left to pick up Ms. Webb's daughter, who had been staying with her father.  When they arrived back at the apartment, they saw fire trucks and police officers around the complex.

Webb testified that, during the course of their relationship, Hickman made various comments about States. Specifically, he told her that States did not have a male friend and that he thought she might be "gay."  He also mentioned that States would not talk to him when he spoke to her and that he called her a "bitch" for not responding.   On several occasions, Hickman complained about the sounds States made while walking around her apartment above their bedroom. On one occasion, while Ms. Webb and Hickman were having sex, Hickman told her that he wanted States to be able to hear them.

Hickman's brother, Torrance Davis, testified at trial.[3]  On September 25, 2005, Hickman called him "early" in the morning to ask that he drive from his home on the Eastern Shore of Virginia, more than three hours away, to Hickman's apartment in Baltimore. Hickman "never told [Davis] why" he wanted Davis to come, saying only that he "needed" his brother.  Although Davis ignored many of his brother's subsequent calls, he took other calls and lied to Hickman, saying he was on his way to Baltimore. Eventually, Davis thought that it sounded like something was "really wrong" with his brother. At approximately 3:00 p.m., he left in a beige Dodge Stratus with his friend, Shaheed Armstrong. During the drive, Hickman called Davis to say that he had run out of gas and ask Davis to bring some with him. Davis bought a gas container and gas to take to his brother.

At sunset, Davis and Armstrong arrived at the apartment and parked beside Hickman's car where Hickman and an unknown man were waiting. Davis described the other man's behavior toward them as "rude." This man told Davis and Armstrong that he wanted them to set fire to the apartment complex.   When they refused, the man asked for their driver's licenses, recorded their information, and told them that if they said anything, he would come after them.   Davis gave the gas to this individual, then left with Armstrong.  The entire exchange took

4

about 10 minutes. Davis spoke with police officers about this case on several occasions. The officers repeatedly told Davis that they were investigating his brother.

Shaheed Armstrong also testified at trial.   Armstrong testified that Davis gave the gas container to Hickman while they were in the parking lot, that he and Davis went inside Hickman's apartment to meet the unidentified man, and that it was Hickman who asked them to set the apartment on fire . . . Armstrong also testified that Hickman emptied the gas into a plastic water jug before he and Davis left, and that the stranger pulled a gun on them before taking and recording their names and addresses.

The State introduced evidence that Hickman called his brother multiple times on the day of the murder.   Andrew Scott Arnold, a Sprint Nextel representative, and Philip Smeak, Jr., a Verizon Wireless representative, testified and authenticated call records showing that on Sunday, September 25, 2005, Hickman's cell phone made 63 calls to the cell phone used by Davis. These calls began around 11:45 a.m.   Arnold explained how Davis's cell phone records showed which towers were used to facilitate his calls.   The prosecution offered this evidence to corroborate Davis's testimony that he did not leave his home near Pocomoke City until mid-afternoon and that he had conversations with Hickman while driving to Baltimore.

According to Dr. Carol Allen, the medical examiner who performed the September 26, 2005, autopsy, States died before the fire.   All ten of her fingertips were cut off perimortem, just below the fingernails.[4]  Dr. Allen determined that States died from asphyxia, blunt force injury, and sharp force injury. Her body had 22 points of sharp force trauma, including several to her face and neck, caused by "scissor like implements." Kathy Michael, a crime lab technician, collected evidence from States's apartment. Photographs taken at the scene were authenticated by Michael and entered into evidence. There were no signs of forced entry into the apartment. In the master bedroom she
found blood spatter on the door, on the closet door, which was lying on the floor, on a mattress propped in front of the window, and on a lock box, which was open with its contents scattered on the floor.

Michael seized various items from the apartment, including States's computer and four greeting cards.  The undated cards were of a religious nature  and three  of them  were  signed  only  with  the  email  address  "doyou1972@yahoo.com."[5] Although  the  fire  prevented  recovery  of  fingerprints  at  the  scene,  lab analysis  later  determined  that  Hickman's fingerprint was on the inside of one of the greeting cards.[6]

Christopher Kollman, a computer forensic examiner for the Baltimore City Police Department, examined computers seized from both States's apartment and Hickman's apartment.  In connection with that examination, Kollman also interpreted records subpoenaed from Yahoo and AOL pertaining to email accounts accessed from those computers. States's computer revealed evidence of numerous "instant message" and email communications between States and the user of the email address "doyou1972@yahoo.com." That address was created using the name Ellis Hickman and someone repeatedly logged into the account using Webb's computer. In addition to the message and reply that States forwarded to Dandridge, Kollman recovered a September 8th instant message from States saying: "I would appreciate you not leaving any more cards.  It's uncomfortable for me and my boyfriend.  I wish you wel[l]." A reply email came from Hickman's account just after midnight on September 9th stating "just remember, if you ever need prayer, you can call my prayer line at 410-913-6816," the number of Hickman's cell phone.  After September 9th, States used a different email address and screen name. States signed onto her computer at 10:43 a.m. on September 9; she signed off at 11:35 a.m.

Homicide detectives Kurt Wilhelm and Gerald D'Angelo investigated States's murder. Both testified similarly about the details of their investigation. On September 30, 2005, the detectives met with Hickman and Webb. Hickman denied any knowledge of the murder or the fire. On October 3, 2005, the detectives talked to Hickman and Webb a second time, while they were in the process of moving out of their apartment. Hickman continued to deny any knowledge of what occurred on the day of the fire. Although officers verified that Hickman went to the grocery store and a beauty supply store on the afternoon of September 25th, as he claimed, the forensic evidence described above established a link between Hickman and the victim.  The detectives returned again on October 31 to talk to Hickman and Webb. This time, they informed Hickman that they had more information about his "contacts" with States. When they told Hickman they knew about the cards, he replied that he left them for her because of his ministry.  When they told him they had discovered email contacts and fingerprints on a card, Hickman admitted that he may have" emailed her and left his phone number.  The detectives then arranged for wire taps to be placed on Hickman's phones starting on October 31, 2005, and they followed him for approximately five days. During this surveillance, they heard Hickman say that he knew the police were following him.

Russell Aldrich, Hickman's former boss, testified that on the morning of November 8, 2005, Hickman reported to work, picked up his dump truck, and left to drive his assigned route. That afternoon, the detectives obtained a warrant for Hickman's arrest.   During the course of the day, Hickman abandoned the dump truck and left before his shift was done. The truck was later found parked on the

shoulder of the Jones Falls Expressway. Hickman never came back to work or contacted Aldrich.

Quinn Cokley, who runs Quickly Bail Bonds, knew Hickman, who had asked about becoming a bounty hunter.  A few days before November 10, 2005, Hickman called him to ask whether a warrant for his arrest had been issued. Cokley was not able to provide that information.

At 9:00 p.m. on November 10, 2005, Tanzanerria Allen, a police officer in southern Florida, went to the home of Hickman's sister, Yolonda Cook. Officer Allen's brother has a child with Hickman's sister.   Officer Allen planned to talk to Cook about convincing her brother to turn himself in. When Allen arrived at Cook's house, in uniform and in a marked police car, she saw Hickman outside. Hickman called out to her, "I need to talk to you." Officer Allen responded that she needed a minute. She had Cook get into her police car, then called dispatch to report that she had Hickman in sight. When other officers arrived, Hickman ran. After a helicopter search of the area, he was discovered hiding in a dumpster.

The defense called no witnesses but introduced various documents into evidence.

---

[1]  Photographs of the apartment building show two adjacent apartments on each of two floors, with a common exterior concrete and metal staircase. Tenants and visitors to the other three apartments testified at trial. States lived on the top floor, next door to Matthew Hyle's ex-wife.  Mr. Hickman lived with Sherri Webb on the floor below, directly underneath States and next door to Ms. Wilkins.

[2]  Redd's apartment was not served by the same exterior staircase as Hickman's and Webb's apartment.

[3] When Davis invoked his Fifth Amendment rights, the State moved to compel his testimony. After giving Davis testimonial immunity, the trial court granted the motion.  On cross-examination Davis admitted that, in 2003, he was convicted of giving a false statement to officers.

[4]  This was presumably done in order to prevent DNA samples from being recovered from skin under States's fingernails.

[5]  One card was signed:  "I love you so much and am here to support you in any way possible. Love, Shervon BFF (Remember this)[.]" Although Ms. Bailey testified that States showed her some of the cards that upset her, Bailey did not recognize any of the ones admitted into evidence.  The other three  were accompanied by envelopes, two of these with Bible verse abbreviations and the other saying, "God Bless You!!!"  One of these cards was signed:  "Good

morning!  Doyou1972@yahoo.com[.]"  A third was signed:  "always A friend in
Christ doyou1972@yahoo.com[.]" The fourth was signed:   "As a minister of God
I pray His protection, guidance and blessings over your life!!! God is with you!!!
doyou1972@yahoo.com[.]" The defense submitted into evidence a certificate
from the Universal Life Church in Modesto, California, stating that Hickman was
ordained on August 22, 2000, "and has all rights and privileges to perform in all
duties of the Ministry." Mr. Hickman was born in 1972.

[6] Hickman's fingerprint was found on the fourth card described in note 3.  Exhibit
11 at 1-12.

(ECF No. 15, Ex. 8 at 1-3.)

Petitioner was sentenced on December 12, 2006, to a total term of life without parole plus

30 consecutive years of imprisonment.  (ECF No. 7, Ex. 1 at 3-5.)  He noted a timely appeal

raising the following claims in the Court of Special Appeals:

> 1. Did the trial court err by failing to give the appellant's proposed jury
> instruction regarding the concealment or destruction of evidence by Torrance
> Davis and Shaheed Armstrong?
>
> 2. Did the trial court err by limiting the parties' ability to participate in bench
> conferences?
>
> 3. Was the evidence insufficient to sustain the appellant's convictions for arson
> and murder because it was based on the uncorroborated testimony of
> accomplices?

(ECF No. 7, Ex. 9 at 2.)

Petitioner's convictions were affirmed on November 24, 2008.  (ECF No. 7, Ex. 11.)

Petitioner then filed a self-presented petition for writ of certiorari arguing that the Court of

Special Appeals violated his rights by not accepting his pro se reply brief.  (ECF No. 7, Ex. 12 at

2-3).  The petition was denied on March 13, 2009.  *See Hickman v. State,* 407 Md. 530 (2009).

Petitioner instituted state post-conviction proceedings on March 12, 2010.  (ECF No. 7,

Exs. 1, 13.)  The petition, as amended and construed, alleged: (A) trial counsel was ineffective

for (1) failing to require corroboration regarding accomplice or perpetrator testimony by the State, (2) failing to lay a foundation for introducing inconsistent statements made by the accomplice or perpetrator, (3) failing to present expert testimony which would have proven petitioner's innocence, 4) failing to object to the trial court's limitation on the number of bench conferences and objections that could be made at trial, and (5) failing to file a motion for modification of sentence; (B) appellate counsel was ineffective for (1) not arguing that the State failed to prove his guilt beyond a reasonable doubt, (2) failing to file a reply brief, (3) failing to file a petition for a writ of certiorari, and (4) failing to raise ineffective assistance of counsel claims; (C) the evidence was insufficient to sustain his conviction; (D) the trial court erred by failing to give his proposed jury instruction on the concealment or destruction of evidence as consciousness of guilt; (E)  the Court of Special Appeals erred by not accepting his pro se reply brief for filing; and (F) the State failed to disclose exculpatory evidence.  (ECF No. 7, EX, 13, 14.)

     After a hearing held January 10, 2013, the post-conviction court granted petitioner the right to file a belated motion for modification of sentence, but otherwise denied post-conviction relief.   (ECF No. 7, Ex. 14.)  Petitioner filed an application for leave to appeal that alleged: (A) the trial court violated Maryland law by failing to give his proposed jury instruction on the concealment or destruction of evidence as consciousness of guilt; and (B) trial counsel was ineffective for failing to object to the trial court's limitation on the number of bench conferences and objections that could be made at trial.  (ECF No. 7, Ex 15.)  The Court of Special Appeals summarily denied that application, with the court's mandate issuing on February 18, 2014.  (ECF No. 7, Ex. 16.)

Here, petitioner maintains that (A) the trial court committed misconduct by limiting the number of bench conferences and objections that could be made at trial; (B) trial counsel was ineffective for failing to object to the trial court's limitation on the number of bench conferences and objections that could be made at trial: (C) the evidence was insufficient to sustain his convictions; and (D) the trial court erred by failing to give his proposed jury instruction on the concealment or destruction of evidence as consciousness of guilt.  (ECF No. 1 at 10-24.)

## Procedural Default

Usually, "a federal habeas court may not review constitutional claims when a state court has declined to consider their merits on the basis of an adequate and independent state procedural rule." *Yeatts v. Angelone*, 166 F.3d 255, 260 (4th Cir. 1999).  In that circumstance, the petitioner is said to have procedurally defaulted his claims.

Before petitioner may seek habeas relief in federal court, he also must exhaust each claim presented to the federal court by pursuing remedies available in state court.  *See Rose v. Lundy*, 455 U.S. 509, 521 (1982).  This exhaustion requirement is satisfied by seeking review of the claim in the highest state court with jurisdiction to consider the claim.  *See O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999); 28 U.S.C. § 2254(b)-(c).  Although exhaustion and procedural default are doctrinally distinct concepts, "[a] procedural default may be *caused* by a failure to exhaust federal claims in state court."  *Sandgathe v. Maass*, 314 F.3d 371, 376 (9th Cir. 2002).  Specifically, where "an unexhausted claim would not be entertained by the state court if presented," it is treated as "exhausted and denied on an adequate and independent state-law ground."  *George v. Angelone*, 100 F.3d 353, 364 n.14 (4th Cir. 1996).

If a procedural default has occurred, a federal court may not address the merits of a state prisoner's habeas claim unless the petitioner can show (1) both cause for the default and prejudice that would result from failing to consider the claim on the merits, or (2) that failure to consider the claim on the merits would result in a miscarriage of justice, *i.e.* the conviction of one who is actually innocent.[1]  *See Murray v. Carrier*, 477 U.S. 478, 495-96 (1986); *Breard v. Pruett*, 134 F.3d 615, 620 (4th Cir. 1998).  "Cause" consists of "'some objective factor external to the defense [that] impeded counsel's efforts' to raise the claim in state court at the appropriate time." *Breard*, 134 F.3d at 620 (quoting *Murray*, 477 U.S. at 488).  Even where a petitioner fails to show cause and prejudice for a procedural default, a court must still consider whether it should reach the merits of a petitioner's claims in order to prevent a fundamental miscarriage of justice.  *See Schlup v. Delo*, 513 U. S. 298, 314 (1995).

Respondents maintain that petitioner's claim regarding the trial court's limitation on the number of bench conferences and objections that could be made at trial is procedurally defaulted because it was not preserved for appellate review.  (ECF No. 7 at 25, citing ECF No. 7, Ex. 11 at 1-17.)  Indeed, the Court of Special Appeals found the claim was not preserved for appeal, and petitioner did not directly challenge that determination in his application for writ of certiorari in the Court of Appeals.  He no longer has an opportunity to raise that claim in a Maryland court. *See* Md. Code Ann., Crim. Proc. §§ 7-103(a), 7-106(b)(1)(i).  This claim is thus procedurally defaulted, unless that default is otherwise excused.

Petitioner was provided an opportunity to explain why his claim should not be deemed

---

[1] "Petitioners who wish to use a claim of actual innocence as a gateway to raising an otherwise defaulted constitutional claim must demonstrate by a preponderance of the evidence that a reasonable juror could not have convicted the petitioner in light of the new evidence." *Buckner v. Polk*, 453 F.3d 195, 199-200 (4th Cir. 2006).

procedurally defaulted.  (ECF No. 8.)  Petitioner has responded, arguing that the trial court's

limitations on objections and bench conferences constitute misconduct and violate his right to

due process. (ECF No. 15 at 6.)   There is no suggestion on the record before this court that new

evidence exists indicating petitioner has a viable claim of actual innocence, nor any other basis

for excusing petitioner's failure to present his claim properly to the Maryland courts.  Further,

the record does not suggest that counsel could not voice objections from the trial table without

first requesting a bench conference, nor that petitioner suffered any prejudice as a result of the

limitations imposed.  This absence of prejudice was noted by the Court of Special Appeals, when

it observed that even if counsel had objected to the "perceived 'one bench conference today'

limit…he has not identified a single objection that he failed to make as a result."  (ECF No. 7,

Ex. 11 at 15-17.)  Accordingly, his first claim of judicial misconduct with regard to the

limitations placed on bench conferences and objections is procedurally defaulted.

## Merits

### Standard of Review

Petitioner's remaining claims remain viable for review.  A federal court may not grant a

writ of habeas corpus unless the state's adjudication on the merits: (1) "resulted in a decision that

was contrary to, or involved an unreasonable application of, clearly established Federal law, as

determined by the Supreme Court of the United States"; or (2) "resulted in a decision that was

based on an unreasonable determination of the facts in light of the evidence presented in the

State court proceeding."  28 U.S.C. § 2254(d).

A state adjudication is contrary to clearly established federal law under § 2254(d)(1)

where the state court (1) "arrives at a conclusion opposite to that reached by [the Supreme] Court

on a question of law," or (2) "confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at a result opposite to [the Supreme Court]." *Williams v. Taylor*, 529 U.S. 362, 405 (2000).  Under the "unreasonable application" prong of the standard, a "state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). "Rather, that application must be objectively unreasonable." *Renico v. Lett*, 559 U.S. 766, 773 (2010).  Thus, "an *unreasonable* application of federal law is different from an *incorrect* application of federal law." *Harrington*, 562 U.S. at 101 (quoting *Williams*, 529 U.S. at 410).

Under § 2254(d)(2), "a state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance." *Wood v. Allen*, 558 U.S.290, 301 (2010).  "[E]ven if 'reasonable minds reviewing the record might disagree about the finding in question,'" a federal habeas court may not conclude that the state court decision was based on an unreasonable determination of the facts.  *Id*. (quoting *Rice v. Collins*, 546 U.S. 333, 341-42 (2006)).

Ineffective Assistance of Trial Counsel

When a petitioner alleges a claim of ineffective assistance of counsel, he must show both that counsel's performance was deficient and that the deficient performance prejudiced his defense.  *See Strickland v. Washington*, 466 U.S. 668, 687 (1984).  The second prong requires the court to consider whether there was "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694.  A strong presumption of adequacy attaches to counsel's conduct, so strong in fact that a petitioner

alleging ineffective assistance of counsel must show that the proceeding was rendered fundamentally unfair by counsel's affirmative omissions or errors. *Id*. at 696. Counsel should be strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment and the burden to show that counsel's performance was deficient rests squarely on the defendant. *See Burt v. Titlow*, __ U.S. __, 134 S.Ct. 10, 17 (2013).

A showing of prejudice requires that 1) counsel's errors were so serious as to deprive the defendant of a fair trial whose result is reliable, and 2) there was a reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different. *See Strickland*, 466 U.S. at 687, 694. "The benchmark [of an ineffective assistance claim] must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Id*. at 686. It is not enough "to show that the errors had some conceivable effect on the outcome of the proceeding." *Id*. at 693. Counsel's errors must be "so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id*. at 687; *see also Harrington*, 562 U.S. at 104 (citing *Strickland*, 466 U.S. at 687). A determination need not be made concerning the attorney's performance if it is clear that no prejudice would have resulted had the attorney been deficient. *Strickland*, 466 U.S. at 697.

Petitioner claims that trial counsel was ineffective for failing to object to the trial court's limitation on the number of bench conferences and objections. (ECF No. 1 at 14-17.) In denying this claim, the post-conviction court found as follows:

> Petitioner alleges that trial counsel rendered ineffective assistance by failing to object to – and preserve for appeal – the trial court's limitation on the number of bench conferences that could be requested as well as the number of objections which could be made by counsel. Indeed, Petitioner testified during the Post Conviction hearing that the trial court had announced midway through

his trial that both the State and the Defense were limited to making only one objection and requesting one bench conference per day, but that this restriction would not apply if the trial court ruled in their favor on their previous objection or request.  While Petitioner was unable to identify the portion of the trial transcript in which the trial court articulated this limitation, the remarks appear to have been made by the trial court at the time it ruled that the testimony of Dr. Stephen Seibert, the court-appointed psychiatrist, would not be permitted:

> THE COURT:  Right.  So therefore, any evidence that might cause the jury to reach that fact as a result of speculation on the evidence that is presented I think is certainly prejudicial to the defense so the Court is going to the [sic] take it Mr. Barry used his one requests [sic] for a very effective and appropriate way, and I'm going to rule that the doctor may not testify. . .

> Mr. Barry, in high school football officiating, in professional sports, if that's a request for a ruling, and the ruling isn't changed, then the time out for the request is charged against the party making it.  On the other hand, if the ruling is changed, the time out is not charged so therefore you still have one bench conference available to you today.  (Trial Transcript, Volume V, p. 42-43).

As a result of these remarks, Petitioner contends that his trial counsel was prevented from making further objections or requests to approach the bench at the trial.

In response to Petitioner's allegation, the State pointed out that trial counsel had made two additional objections on the day of the trial court's remarks without interference by the trial court.  Furthermore, while the trial court told Petitioner's trial counsel that he still had one bench conference available to him that day, trial counsel never attempted to use it.  In addition, when Petitioner's trial counsel was asked by the State during the Post Conviction hearing about the effect of the trial court's remarks on him, he testified that he understood the trial court's remarks to be a signal of its frustration with the pace of the trial rather than a real limitation on trial counsel. Petitioner's trial counsel also made clear that he did not feel hindered from making objections or requesting to approach the bench when appropriate even after the trial court made the remarks.

After reviewing the trial transcript as well as the opinion of the Court of Special Appeals and considering the testimony given at the Post Conviction hearing and relevant case law, this Court finds that Petitioner's allegation of ineffective assistance of counsel based on his trial counsel's failure to object to the trial court's supposed limitation on objections and bench conferences is without merit.  While this Court has reason to doubt whether the trial court truly intended to limit trial

15

> counsel in these ways, Petitioner's argument falls short even if the trial court's remarks were taken seriously, because Petitioner has not identified one objection or request for a bench conference which trial counsel was prohibited from making. In addition, this issue was raised and decided on appeal and in this way has been fully and finally litigated.

> (*Hickman v. State*, No. 2390, slip op. at 16-17 (Md. Nov. 24, 2008)). Therefore, Petitioner has failed to meet his burden of proving that trial counsel's performance was deficient or prejudicial in responding to this issue. As such, Petitioner's contention does not satisfy the standard set forth in Strickland and Bowers.

(ECF No. 17, Ex. 14 at 8-9.)   At the post-conviction hearing, both Hickman and trial counsel

testified that the trial judge indicated the proceedings should be moving along faster.   Hickman

described the situation as follows:

> On the fourth day of trial there was a testimony, I think a psychiatrist…was gonna testify and …there were some…motions in limine and there was some objections that was being made at that time.   And as Mr. Barry began to…make his objection, Judge Daniels issued a mandate that…this trial was taking absolutely too long and it should be moving along faster than what it was moving along. And he said that as of today…each party…will get…a opportunity to make one objection and one bench conference.

> And so…Mr. Barry asked the question, he said so will…this bench, will this objection be held against me?

> And…the judge told him, he made some….statement along the lines of like a moving goal post and…that if…it's like a moving goal post that if you make [and] win an objection it's not held against you like…in other words like using football terms.   Like…a football challenge that's if you make the objection and you win then no, it's not held against you.

> So Mr. Barry went on and, and we went on and he argued the issue and…he lost the objection.   So later on through the day, throughout that day…throughout that trial, that fourth day of trial Mr. Barry wanted to make an objection and…[Judge] Daniels told him that he had already used his one objection that day.

> And later on that day also Mr. Cox [the Assistant State's Attorney] had made an objection to something and…he made a reference as well will this be my…this

one be held…against me or…something along those lines "will this be my only one as well?"

And the judge statement was "yes."

. . .

I really don't know anything about law, but I do know how to read and I, I definitely have good…comprehension skills, and upon my incarceration I was afforded the opportunity to purchase the…Maryland Rules and…upon reading in the Maryland Rules at no time should the defense, as well as the prosecution,…be limited in…bench conferences or objections…

. . .

And…then on the fifth day as we was beginning to start trial…that morning, you know, they have motions or whatever…when Judge Daniels…stated that the ruling he made yesterday regarding one objection per day it don't stands for today and throughout the rest of the trial.

…There were some…serious objections that Mr. Barry had wanted to make but he wasn't allowed to make them.

. . .

And Mr. Barry, he argued with the judge that day.  I mean almost…I could say borderline, right at the borderline of…disrespect.  Not…contempt but borderline disrespect because Mr. Barry didn't feel that that was right.

(ECF No. 23-1 at 19-21.)   During testimony, trial counsel was asked whether he was

intimidated by Judge Daniels when he stated that he was not going to consider multiple

bench conferences on any given day.  Counsel responded:

> No sir.  He did, he did say that, -- … -- and I heard the discussion that that's not in the transcript.  Whether it was…or not he clearly said that.  I personally took it that he was frustrated, that he was not actually restricting what I did and that if I could have come up with an excuse for an argument to go outside that to make a record I'd have done it.
>
> Q: Okay.  If, if you felt that there was a need to make a bench conference, notwithstanding the admonition of Judge Daniels, would you have requested a bench conference?

17

Yes. And in fact I think there were two bench conferences later that day. There was one, at my request. Not just the one that's been mentioned from Mr. Cox. I think there were two at my request. One…just had to do with scheduling. And so again my recollection is at the time Judge Daniels commented on it that this is just scheduling so that doesn't count. And then I think very late in the day, like quarter to five or something like that I did have. Or did request another bench conference which was held.

(ECF No. 23-1 at 96-97.)

After hearing testimony, reviewing the trial transcripts, and reading the appellate briefs and opinion, the post-conviction court found no evidence that the trial court actually intended to limit any trial objections or bench conferences or that trial counsel was intimidated or hindered in making objections or requesting bench conferences. The post-conviction court further found that "even if the trial court's remarks were taken seriously…Petitioner has not identified one objection or request for a bench conference which trial counsel was prohibited from making." (ECF 7, Ex. 14 at 8-9.) Citing *Strickland,* the post-conviction court found that Hickman did not meet his burden of proving trial court's performance was deficient or prejudicial in responding to this issue. (*Id.* at 9.) This finding is reasonable; thus, Hickman's ineffective assistance claim provides no basis for relief under 28 U.S.C. § 2254(d).

<u>Sufficiency of the Evidence</u>

Any challenge to sufficiency of evidence is necessarily a due process challenge. *West v. Wright*, 931 F.2d 262, 266 (4th Cir. 1991), overruled on other grounds, 505 U.S. 277 (1992). In determining whether there is sufficient evidence to support a conviction the court examines "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U. S. 307, 319 (1979). The fact finder, rather than the reviewing court,

is charged with "resolv[ing] conflicts in the testimony, [weighing] the evidence, and [drawing] reasonable inferences from basic facts to ultimate facts." *Id*. Circumstantial as well as direct evidence must be considered and the prosecution must be given the benefit of all reasonable inferences. *See United States v. Tresvant*, 677 F.2d 1018, 1021 (4th Cir. 1982). Circumstantial evidence alone can be sufficient to support a conviction. *See Stamper v. Muncie*, 944 F.2d 170, 174 (4th Cir. 1991).

On appeal, Hickman argued that the evidence was insufficient to sustain his convictions for arson and murder where the State's case was based on the uncorroborated testimony of accomplices. (ECF No. 7, Ex. 9 at 19-22.), The appellate court found the claim unpreserved, but nonetheless examined it, finding sufficient corroboration based on the cell phone records and forensic evidence presented by the State and other circumstantial evidence unrelated to the testimony of Davis and Armstrong. (ECF No. 7, Ex. 11 at 17-20.) The post-conviction court then examined whether trial counsel failed to require the State to corroborate the testimony of Davis and Armstrong with independent evidence. The post-conviction court noted that:

> According to Petitioner, while the testimony of Davis and Armstrong was the most damaging evidence against him at trial, it was insufficient to support a guilty verdict without corroboration. In response, the State contends that, as Petitioner himself referenced in his Petition, trial counsel had in fact asserted during trial that Davis and Armstrong were accomplices and that their testimony required corroboration, putting the State to the test in this regard. Furthermore, the State also argued that Petitioner's allegation regarding the uncorroborated testimony of Davis and Armstrong had been raised and decided on appeal.

> After reviewing the trial transcript as well as the opinion of the Court of Special Appeals and considering the testimony given at the Post Conviction hearing and relevant case law, this Court finds that Petitioner's allegation of ineffective assistance of counsel based on failure to require corroboration by the State of accomplice testimony is without merit. Petitioner had asserted this same argument on appeal and it ultimately was rejected by the Court of Special Appeals

based on its finding that there was sufficient evidence to corroborate the testimony of Davis and Armstrong.

(ECF No. 7, Ex. 14 at 4-5.)  The state courts' determination that the circumstantial evidence presented by the State was sufficient for the jury to find beyond a reasonable doubt that Hickman was guilty of murder and arson is supported by the record, survives scrutiny under 28 U.S.C. §2254(d), and shall not be disturbed.

## Failure to Give Proposed Jury Instructions

Hickman complains that the trial court violated Maryland Rule 4-325 in denying an instruction with regard to the concealment or destruction of evidence by Davis and Armstrong as consciousness of guilt.  (ECF No. 1 at 22-24.)  This claim was examined on direct appeal by the Court of Special Appeals, which found as follows:

> At trial, Hickman contended that Torrance Davis and Shaheed Armstrong set the fire in order to cover up the murder and left with the gas can, which constituted evidence of the arson.  Defense counsel requested the following jury instruction in support of this "destruction of evidence" theory:
>
>> You have heard that Torrance Davis and Shaheed Armstrong concealed evidence and destroyed evidence in this case.  C oncealment or destruction of evidence is not enough by itself to establish guilt, but may be considered as evidence of guilt. Concealment or destruction of evidence may be motivated by a variety of factors, some of which are fully consistent with innocence.
>>
>> You must first decide whether Torrance Davis and Shaheed Armstrong concealed evidence and destroyed evidence in this case. If you find that Torrance Davis and Shaheed Armstrong concealed evidence and destroyed evidence in this case, then you must decide whether that conduct shows a consciousness of guilt.
>
> The trial court refused to give this instruction because "it would unnecessarily confuse the jury and would direct their attention away from deciding the guilt or innocence of Mr. Hickman in determining guilt or innocence of Shaeed [sic] Armstrong and Mr. Torrance Davis, who are not defendants in the case."  Hickman argues that, "[b]ecause the trial court failed

to give a requested instruction on a theory of the defense that was fairly supported by the evidence, this case must be reversed and remanded for a re-trial." We disagree.

"As a general rule, judges are accorded broad discretion in determining whether a particular instruction should be given on a particular occasion, although statutes, court rules, and case law may place limits on the judge's discretion." *Carter v. State*, 366 Md. 574, 584 (2001). Md. Rule 4-325(c) provides, in pertinent part, that "[t]he court may, and at the request of any party shall instruct the jury as to the applicable law[.]" When requested in a criminal case, the court must "give an advisory instruction on every essential question or point of law supported by the evidence." *Bruce v. State*, 218 Md. 87, 97 (1958). In deciding whether to give a requested instruction, the trial court must determine, inter alia, whether it "is applicable under the facts and circumstances of the case at hand[.]" *Evans v. State*, 333 Md. 660, 695, cert. denied, 513 U.S. 833, 115 S. Ct. 109 (1994). The Court of Appeals has recognized that, when the proposed instruction relates to a charge that is not before the jury, the instruction does not satisfy this test and the trial court does not abuse its discretion in refusing to give it. *See, e.g., Dean v. State*, 325 Md. 230, 240 (1992) (no abuse of discretion in refusing to give instruction on assault crime that prosecution nol prossed). *See also Tharp v. State*, 129 Md. App. 319, 332-33 (1999) (no error in refusing to give accessory after the fact instruction because defendant was not charged with that crime), aff'd on other grounds, 362 Md. 77 (2000). On appeal, the burden is on the complaining defendant "to show both prejudice and error." *Farley v. Allstate Ins. Co.,* 355 Md. 34, 47 (1999); *Tharp, supra*, 129 Md. App. at 329.

The requested instruction related to factual allegations and not legal principles. In contrast to instructions on the law, "[i]nstructions as to facts and inferences of fact are normally not required." *Patterson v. State*, 356 Md. 677, 684 (1999). Rather, it is the responsibility of defense counsel to emphasize such evidentiary facts in argument. *See, e.g., id.* at 694 (no error in refusing to give instruction regarding missing witness). That is precisely what happened in this case. Although neither Davis nor Armstrong was charged with a crime, the trial court permitted defense counsel to argue to the jury that they concealed and destroyed evidence. This may have encouraged the jury to find reasonable doubt as to whether Hickman harassed and murdered States and then set the fire to cover up his crime. For example, counsel argued in closing:

> We know that Torrance and Shaheed set the fire. We know that they have not been charged for this, and so they walked away from this. They walked away. Like I told you before, there's no doubt they are guilty of a first-degree arson.

> On this record, we find no legal error, abuse of discretion, or prejudice warranting a new trial. Hickman cites *Robertson v. State*, 112 Md. App. 366 (1996), as an example of when a jury instruction is required to satisfy due process requirements. In *Robertson* we reversed a first degree murder conviction because the trial court did not give the requested alibi instruction. *See id.* at 380, 386. An alibi is a defense that places the defendant, at the time the crime occurred, in a place other than the crime scene. *Id.* at 375. We observed that such an instruction may be necessary to reinforce . . . that the burden is always with the State to prove beyond a reasonable doubt that the defendant was present at the scene of the crime at the time the State asserts that the crime was committed. Id. at 386. In contrast to the alibi instruction omitted in Robertson, the concealment/destruction of evidence instruction omitted in this case is not necessary to reinforce the State's burden of proof.

(ECF No. 7, Ex. 11 at 12-15.) To the extent that Hickman's claim regarding jury instructions is cognizable, the appellate court's determination is reasonable and will not be disturbed pursuant to 28 U.S.C. § 2254(d).

## Conclusion

The record establishes, and this court determines, that Hickman is not entitled to federal habeas relief. Hickman's first claim of trial court error is procedurally defaulted, and there is no basis for finding constitutional deficiencies in the state court proceedings as to his remaining claims.

Additionally, a certificate of appealability is not warranted. Such a certificate may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). Where a district court rejects a prisoner's claims on the merits, that standard is met if the prisoner "demonstrate[s] that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong," *Tennard v. Dretke*, 542 U.S. 274, 282 (2004), quoting *Slack v. McDaniel*, 529 U.S. 473, 484 (2000), or that "the issues presented were adequate to proceed further," *Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003), quoting *Slack*, 529 U.S. at 484. Where a district court rejects a prisoner's claims "on procedural

grounds without reaching the prisoner's underlying constitutional claim," the prisoner must show, "at least, that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right, and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." *Slack,* 529 U.S. at 484.  Because this court finds that there has been no substantial showing of the denial of a constitutional right, a certificate of appealability will not issue.  *See* 28 U.S.C. § 2253(c)(2).

Accordingly, the petition shall be dismissed with prejudice and a certificate of appealability will not issue. A separate order follows.


Date:   June 6, 2016                                    _____/S/_____
                                                                        Catherine C. Blake
                                                                        United States District Judge